**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JOHN J. CHRISTOPHER | : | CIVIL ACTION |
| | : | |
| | : | |
| v. | : | |
| | : | NO. 05-0115 |
| FIRST MUTUAL CORP. and | : | NO. 05-1149 |
| RICHARD KELLY | : | CONSOLIDATED |

**MEMORANDUM AND ORDER**

NORMA L. SHAPIRO, S.J.                                    APRIL 21, 2008

    This action arises from a series of home equity loans to plaintiff John J. Christopher

("Christopher") secured by mortgages on Christopher's residence.  Christopher and defendants

First Mutual Corp. ("First Mutual"), a licensed mortgage banker, and Richard Kelly ("Kelly"), a

loan officer, have filed cross-motions for summary judgment on Christopher's claims under the

Pennsylvania Usury Statute, 41 Pa. Cons. Stat. Ann. §§ 501 *et seq.*, and the Pennsylvania Unfair

Trade Practices and Consumer Protection Law ("UTPCPL"), 73 Pa. C.S.A. § 201-01, *et seq*.

Defendants have also filed a motion *in limine* to preclude Christopher from calling their counsel,

Janet Gold, Esq., as a trial witness.  The federal claims having been dismissed, this court has

supplemental jurisdiction over Christopher's remaining claims under 28 U.S.C. § 1367(a).[1]

_____

        [1]The court does not have diversity jurisdiction over Christopher's claims because both
Christopher and First Mutual are alleged to be citizens of Pennsylvania, and the record does not
show otherwise.

        A federal district court may decline to exercise supplemental jurisdiction over a claim if it
has dismissed all claims over which it has original jurisdiction.  28 U.S.C. § 1367(c)(3).  In
deciding whether to exercise supplemental jurisdiction, the court should consider "judicial
economy, convenience, and fairness to the litigants."  United Mine Workers v. Gibbs, 383 U.S.
715, 726 (1966); Growth Horizons, Inc. v. Delaware County, Pennsylvania, 983 F.2d 1277, 1284
(3d Cir. 1993).  Discovery has been completed and the parties have argued their motions for

Defendants' motion for summary judgment will be granted in part, Christopher's motion for summary judgment will be denied, and defendants' motion *in limine* will be granted.

## I.      FACTS

Christopher is an elderly male who owns a row house at 1819 Gillingham Street in Philadelphia, Pennsylvania.  (Christopher Dep. 10:17-21, Nov. 28, 2006.)  He moved to the United States from Trinidad in 1949, and has a seventh grade education from Trinidad.  (Christopher Dep. 11:2-8.)  Christopher learned to speak and read English in Trinidad.  (Christopher Dep. 22:2-6.)  He suffers from heart disease and gout.  (Christopher Dep. 17:7-20:15.)  When Christopher bought his row house in 1953, he took out a $6,500 mortgage loan to help pay for the house.  (Christopher Dep. 25:3-9.)  In subsequent years, Christopher took out more loans to do wall-to-wall carpeting and fix his porch.  (Christopher Dep. 25:10-26:11.)

Christopher's amended complaint avers that in September 1995, Christopher took out a home equity loan through East Coast Mortgage to finance home improvements ("1995 Loan").  (Amended Compl. ¶ 8.)  According to an unsigned Note in the record, the principal amount of the loan was $16,500 and the yearly interest rate was 14.99%.  (Pl.'s Mot. Summ. J., Ex. D.)  The loan was a fifteen year fixed rate mortgage requiring Christopher to make 180 monthly payments of $230.82.  (Pl.'s Mot. Summ. J., Ex. D.)  The 1995 Loan was reassigned to The Money Store.  At deposition, Christopher did not recall taking out the 1995 Loan for $16,500, and denied taking a loan from East Coast Mortgage.  (Christopher Dep. 36:14-24, 47:9-16.)

From 1995 to 1997, Christopher took out additional loans from Second Consumer

---

summary judgment before this court.  The interest of judicial economy favors this court's exercise of supplemental jurisdiction over Christopher's remaining state law claims.

Discount Company to help him catch up on his bills.  (Christopher Dep. 54:14-56:15.)

### A.      1997 Loan

Christopher testified he first came into contact with defendants when he called First Mutual in response to a television advertisement.  (Christopher Dep. 63:2-12.)  First Mutual's records show that its telemarketing department contacted Christopher to ask if he was interested in mortgage financing or refinancing.  (Lesiger Aff. ¶ 3.)  Christopher stated interest in refinancing an existing mortgage at a lower fixed rate.  (Pl.'s Mot. Summ. J., Ex. E; Lesiger Aff. ¶ 4.)  Kelly, a loan officer employed by First Mutual from August, 1997, to spring 2000, was assigned to contact Christopher by telephone to determine the nature and amount of the mortgage.  (Kelly Dep. 12:19-22, 16:22-24, Dec. 8, 2006; Lesiger Aff. ¶¶ 4-5.)  Kelly visited Christopher at his home to fill out loan application papers.[2]  (Christopher Dep. 63:13-64:24.)  Kelly was compensated by commission based on revenue from loans assigned to him.  (Lesiger Aff. ¶ 5.)

First Mutual decided to make a first mortgage loan ("1997 Loan") to Christopher to pay off his existing first mortgage.  (Lesiger Aff. ¶ 9.)  First Mutual obtained Christopher's title report, which revealed sixteen open mortgages and one municipal lien.  (Lesiger Aff. ¶ 10, Ex. A.)  First Mutual worked with Second Consumer Discount Company to obtain the satisfactions to have fourteen of the mortgages removed of record.  (Lesiger Aff. ¶ 10.)  TA Title Insurance Company, an independent title company which handled First Mutual's loan closings, contracted the work on Christopher's 1997 Loan to an attorney, Murray D. Levin, Esq.  (Lesiger Aff. ¶ 11.)

---

[2]This visit was one of two face-to-face meetings that Kelly recalls having with Christopher.  Kelly recalls visiting Christopher a second time for a social call.  (Kelly Dep. 182:7-183:6.)  Kelly could not recall the date of the second visit.  (Kelly Dep. 183:7-12.)

On November 7, 1997, Levin conducted the settlement and notarized the loan documents at Christopher's home.  (Lesiger Aff. ¶ 11.)  Attorney Janet L. Gold, Esq., reviewed the loan documents to ensure the mortgage would be secured in a first lien position.  (Lesiger Aff. ¶ 12.) First Mutual forwarded the mortgage to TA Title Insurance Company along with $520 in recording fees for the removal of Christopher's old mortgages from the record.  (Lesiger Aff. ¶ 13.)

The principal amount of the 1997 Loan was $22,000 and the interest rate was 11.33%. (Pl.'s Mot. Summ. J., Ex. E.)  Christopher was required to make 180 monthly payments of $254.63.  (Pl.'s Mot. Summ. J., Ex. E.)  A check for $609.73 was written to Christopher.  (Kelly Dep. 48:18-49:4.)  Christopher testified he knew what the monthly payments would be when he signed the loan papers, but he did not focus on the interest rate because he trusted it would be reasonable.  (Christopher Dep. 68:17-69:10.)  Christopher then testified he did not remember signing papers for the 1997 Loan, and he did not read any of the documents or review the numbers because he trusted First Mutual.  (Christopher Dep. 72:5-15, 79:3-5, 82:14-20.)  A mortgage signed with Christopher's name is in the record.  (Levin Aff., Ex. A.)  When shown the signed mortgage and promissory note at deposition, Christopher denied that the signatures on the documents were his.  (Christopher Dep. 74:12-75:2.)  Levin's affidavit states that prior to notarizing the loan documents, Levin required Christopher to produce appropriate identification. (Levin Aff. ¶ 5.)  Christopher also testified no one explained he had three days to change his mind and cancel the 1997 Loan.  (Christopher Dep. 78:3-14.)

The 1997 Loan was used to pay off the 1995 Loan, a second mortgage with Norwest Financial Consumer Discount Company ("Norwest Financial"), and charges from the

Department of Revenue, the Water Revenue Bureau, Wanamakers, and the City of Philadelphia. (Lesiger Aff. ¶ 14, Ex. A-1.)  Christopher also used the loan proceeds to pay for new windows. (Christopher Dep. 53:12-18.)

The mortgage provided: "The Note or a partial interest in the Note (together with this Security Instrument) may be sold one or more times without prior notice to Borrower.  A sale may result in a change in the entity (known as the 'Loan Servicer') that collects monthly payments due under the Note and this Security Instrument."  (Levin Aff., Ex. A.)  On November 20, 1997, First Mutual sold the 1997 Loan with a fixed interest rate of 11.33% to Ford Consumer Finance Company ("Ford Finance").  (Lesiger Aff. ¶ 5.)  On December 11, 1997, First Mutual prepared a document addressed to Christopher, which stated the servicing of Christopher's loan would be transferred to Ford Finance within the next few weeks.  (Pl.'s Mot. Summ. J., Ex. E.)

Christopher testified he could not recall any other contact with First Mutual after taking the 1997 Loan.  (Christopher Dep. 66:23-67:4.)

**B.      1998 Loan**[3]

On August 24, 1998, Christopher took another mortgage loan of $1,788 from Norwest Financial.  (Lesiger Aff. ¶ 16, Ex. C.)  The mortgage with Norwest Financial required monthly payments of $149.  (Lesiger Aff. ¶ 16, Ex. C.)  Because Christopher was also making monthly payments of $254.63 on the 1997 Loan, Christopher was paying an approximate total of $404 per

---

[3]The record for the 1998 Loan is less complete than the record for the 1997 Loan and 2000 Loan because First Mutual was not able to locate the 1998 Loan file.  (Lesiger Aff. ¶ 18.) First Mutual is required to retain files for two years from the date they are paid in full, and the 1998 Loan was paid in full on or about February 4, 2000.  (Lesiger Aff. ¶ 18.)  Defendants assert the majority of documents relating to the 1998 Loan were produced by Christopher in discovery. (Lesiger Aff. ¶ 18.)

month in mortgage payments.  (Lesiger Aff., Ex. D.)

It is First Mutual's policy not to contact existing customers within twenty-four months of the date on which a loan was made.  (Lesiger Aff. ¶ 16.)  Christopher contacted First Mutual for another loan and mortgage refinancing.  (Lesiger Aff. ¶ 16; Kelly Dep. 158:18-159:6.)  An unsigned Uniform Residential Loan Application stated Christopher had a monthly income of $1,327.52 and monthly housing expenses of $303.07.  (Lesiger Aff., Ex. D.)  Under the proposed refinancing, which would pay off the Norwest Financial mortgage, Christopher would have total monthly housing expenses of $365.11.  (Lesiger Aff., Ex. D.)  The loan application also stated Christopher would receive $4,391.40 in cash.  (Lesiger Aff., Ex. D.)

Lesiger averred that First Mutual sends a Section 32 Notice under Regulation Z to the borrower at least three days prior to the closing of a loan.  (Lesiger Aff. ¶ 3.)  A Regulation Z, Section 226.32(c) Disclosure, addressed to Christopher and dated November 23, 1998, disclosed a proposed loan amount of $31,000, an annual percentage rate of 13.65%, and monthly payments of $365.11.  (Lesiger Aff., Ex. H.)

On November 30, 1998, Christopher's loans were refinanced through First Mutual ("1998 Loan").  The principal balance of the 1998 Loan was $31,000.00 and the interest rate was 11.65%.  (Pl.'s Mot. Summ. J., Ex. G.)  Christopher was required to make monthly payments of $365.11.  (Pl.'s Mot. Summ. J., Ex. G.)  The 1998 Loan was used to pay off the existing mortgages of $21,645 and $1,460, and a water and sewer bill of $26.58.  (Pl.'s Mot. Summ. J., Ex. G.)  Christopher received $2,647.75 in cash.  (Pl.'s Mot. Summ. J., Ex. G.)  The remainder of the loan paid for fees incurred by First Mutual and TA Title Insurance Company; these include settlement and closing fees and attorneys' fees for Levin and Gold.  (Pl.'s Mot. Summ. J., Ex. G.)

6

At deposition, Christopher denied signing an application, settlement statement, or mortgage for the 1998 Loan. (Christopher Dep. 115:10-117:17.) Christopher also denied signing a Federal Truth in Lending disclosure statement or a Regulation Z, Section 226.32 Disclosure. (Christopher Dep. 117:18-118:14.) A settlement statement for the 1998 Loan, signed with Christopher's name, and dated November 30, 1998, is in the record. (Pl.'s Mot. Summ. J., Ex. G.) A mortgage signed with Christopher's name and dated November 30, 1998, is in the record. (Lesiger Aff., Ex. F.) A notice of a right of recision, informing Christopher of his right to cancel the 1998 Loan on or before December 3, 1998, is in the record; it is addressed to Christopher's residence. (Lesiger Aff., Ex. G.) Christopher testified the signatures on various loan documents were forgeries. (Christopher Dep. 121:22-122:6.) Levin averred he acted as the closing agent and required Christopher to produce appropriate identification before notarizing the loan documents. (Levin Aff. ¶ 5.)

The mortgage provides: "The Note or a partial interest in the Note (together with this Security Instrument) may be sold one or more times without prior notice to Borrower. A sale may result in a change in the entity (known as the 'Loan Servicer') that collects monthly payments due under the Note and this Security Instrument." (Levin Aff., Ex. C.) An unsigned Servicing Disclosure Statement addressed to Christopher stated there was a 26-50% chance the servicing of Christopher's loan would be transferred in the 12 month period after the loan was funded. (Pl.'s Mot. Summ. J., Ex. I.) First Mutual sold the 1998 Loan to Associates Financial. (Lesiger Aff. ¶ 8.)

### C.    2000 Loan

On December 31, 1999, Christopher spoke with Kelly about obtaining another loan to

7

take out cash, make home improvements, pay off debts, and decrease the interest rate ("2000

Loan"). (Lesiger Aff. ¶ 26, Ex. I; Pl.'s Mot. Summ. J., Ex. J.) That day, First Mutual sent

Christopher a Good Faith Estimate that the loan amount would be $38,250.00 and Christopher

would receive $2,937.15 in cash. (Lesiger Aff., Ex. J-2.) A Uniform Underwriting Transmittal

Summary stated Christopher had a total monthly income of $1,670.09, and was paying $412.46

per month in housing expenses. (Pl.'s Mot. Summ. J., Ex. J.)

On January 7, 2000, First Mutual prepared a loan summary reporting that the "Sales

Person" was Kelly and the "Company" was First Union. (Pl.'s Mot. Summ. J., Ex. J, Bates

000338.) A document prepared by Associates Home Equity Services stated the 2000 Loan was

brokered by First Mutual and was closing in First Mutual's name. (Pl.'s Mot. Summ. J, Ex. J,

Bates 000470.)

On January 19, 2000, Christopher signed an Estimated Truth in Lending Statement which

estimated an annual percentage rate of 10.83%, monthly payments of $321.63 for fifteen years,

and a balloon payment of $31,120.89 at the end of the fifteen years. (Lesiger Aff., Ex. K.)

There are two final Truth in Lending Disclosure Statements which disclosed a different

type of loan than the Estimated Truth in Lending Statement. (Pl.'s Mot. Summ. J., Ex. J.) The

loan was extended to thirty years under the same monthly payment terms, but there was no

balloon payment. (Lesiger Aff. ¶¶ 27, 30.) There are discrepancies in the two final Truth in

Lending Disclosure Statements, both of which are signed with Christopher's name. The first

statement, with a printed and handwritten date of January 31, 2000, disclosed an amount financed

of $35,535.92, a finance charge of $79,950.88, an annual percentage rate of 10.27%, a monthly

payment amount of $321.63, and a total payment amount of $115,786.80. (Pl.'s Mot. Summ. J.,

8

Ex. J.)  The second disclosure statement, with a printed date of January 31, 2000, disclosed a

higher finance charge of $80,250.88 and a higher annual percentage rate of 10.37%.  (Pl.'s Mot.

Summ. J., Ex. J.)  The amount financed, the monthly payment amount, and the total payment

amount remained the same.  Lawrence R. Lesiger, President of First Mutual, submitted an

affidavit conjecturing that the first statement, disclosing an annual percentage rate of 10.27%,

was corrected but never discarded, and was given to Christopher for signing along with the

corrected statement.  (Lesiger Aff. ¶ 32.)

A Uniform Residential Loan Application, signed by Christopher and dated January 31,

2000, disclosed a loan amount of $38,250 at an interest rate of 9.50%, to be paid over thirty

years, and $3,601.57 cash to be paid to Christopher.  (Pl.'s Mot. Summ. J., Ex. J.)

The 2000 Loan closed on January 31, 2000.  (Zenszer Aff. ¶ 2.)  A mortgage, two

settlement statements, and a Note for the 2000 Loan, signed by Christopher, are in the record.

(Kelly Dep., Ex. F, Ex. G; Pl.'s Mot. Summ. J., Ex. J, Ex. T.)  First Mutual used the services of

an independent closing agent, Frank J. Zenszer, a notary public of the Commonwealth of

Pennsylvania.  (Lesiger Aff. ¶ 33.)  Before notarizing the documents at the closing of the 2000

Loan, Zenszer required Christopher to produce appropriate identification.  (Zenszer Aff. ¶ 4.)

Christopher testified that the signature on the settlement sheet for the 2000 Loan was his, but that

he did not read the document before signing it.  (Christopher Dep. 136:10-21.)  TA Title

Insurance Company handled the disbursements on the account.  (Lesiger Aff. ¶ 33.)

The principal amount of the 2000 Loan was $38,250 and the yearly interest rate was

9.5%.  (Pl.'s Mot. Summ. J., Ex. J.)  Christopher was required to make monthly payments of

$321.63.  (Pl.'s Mot. Summ. J., Ex. J.)  He received $3,255.10 in cash.  (Lesiger Aff. ¶ 33.)

Kelly could not explain why this cash amount differed from the amount reported on the Uniform Residential Loan Application, which was signed the same date.  (Kelly Dep. 236:6-18.)

There is also a discrepancy between the cash amounts listed in two settlement statements in the record, both signed by Christopher on January 31, 2000.  One settlement statement, signed by both Christopher and Zenszer, stated Christopher would receive $3,225.10 in cash.  (Pl.'s Mot. Summ. J. Ex. J, Bates No. 000258.)  What appears to be a separate settlement statement, signed by Christopher only, stated Christopher would receive $3,712.62 in cash.  (Pl.'s Mot. Summ. J. Ex. J, Bates No. 000259.)

The mortgage provides: "The Note or a partial interest in the Note (together with this Security Instrument) may be sold one or more times without prior notice to Borrower.  A sale may result in a change in the entity (known as the 'Loan Servicer') that collects monthly payments due under the Note and this Security Instrument."  (Kelly Dep., Ex. G.)  On February 15, 2000, First Mutual sold the 2000 Loan to First Union Home Equity Bank ("First Union").  (Lesiger Aff. ¶ 34.)  On February 16, 2000, First Mutual prepared a document addressed to Christopher and stating that the servicing of his mortgage loan would be transferred to First Union within the next few weeks.  (Pl.'s Mot. Summ. J., Ex. J.)  The document also stated, "This will not change any of the terms your [sic] original loan."  (Pl.'s Mot. Summ. J., Ex. J.)  The 2000 Loan eventually was assigned to Wachovia Home Equity Bank, N.A. ("Wachovia").

After the closing of the 2000 Loan, First Mutual did not receive any further communication from Christopher until Christopher's first lawsuit was filed in November, 2004.  (Lesiger Aff. ¶ 34.)  At deposition, Christopher repeatedly stated he never had a problem with First Mutual, and his troubles started only after his loan was assigned to Wachovia and his

10

payments got higher.  (Christopher Dep. 63:20-64:1, 65:20, 66:2-22, 68:13, 69:14-17, 75:10-13, 82:19-20, 85:24-86:4.)  At his deposition, Kelly was shown letters from Christopher to Kelly; in the letters, Christopher stated he did not understand certain documents.  (Kelly Dep. 150:11-152:1.)  Kelly could not recall which documents were referenced by Christopher in the letters. (Kelly Dep. 150:21-23, 152:5-8.)

## II.    PROCEDURAL HISTORY

On November 29, 2004, Christopher filed a complaint in the Court of Common Pleas of Philadelphia County against defendants First Mutual and Kelly.  The complaint asserted seven claims arising from the 1997 Loan and the 1998 Loan.  Christopher asserted: (1) violation of the Homeownership and Equity Protection Act ("HOEPA"), 15 U.S.C. § 1939(a), by First Mutual; (2) violation of the Pennsylvania Usury Statute, 41 Pa. Cons. Stat. Ann. §§ 501 *et seq.*, and the Pennsylvania Home Improvement Finance Act ("HIFA"), 73 Pa. Cons. Stat. Ann. §§ 500-101 *et seq.*, by First Mutual; (3) violation of the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691(d)(1), by First Mutual; (4) violation of the Pennsylvania UTPCPL, 73 Pa. Cons. Stat. Ann. §§ 201-1 *et seq.*, by both defendants; (5) breach of fiduciary duty under Pennsylvania law by Kelly; (6) fraud under Pennsylvania law by both defendants; and (7) violation of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2602 *et seq.*, by both defendants. Defendants removed the action arising from the 1997 Loan and 1998 Loan to this court, where it was filed as Civ. A. No. 05-0115.

On January 28, 2005, Christopher filed another complaint in the Court of Common Pleas of Philadelphia County against defendants First Mutual Corp. and Kelly.[4]  The complaint

---

[4]The complaint also asserted claims against defendant Associates Financial Services Company, Inc., but the claims have been settled.

asserted claims arising from the 2000 Loan.  Christopher asserted: (1) violation of the HOEPA by

First Mutual; (2) violation of the Pennsylvania Usury Statute and HIFA by First Mutual; (3)

violations of ECOA by First Mutual; (4) violation of the Pennsylvania UTPCPL by both

defendants; (5) breach of fiduciary duty under Pennsylvania law by Kelly; and (6) violation of the

RESPA by both defendants.  Defendants removed the action arising from the 2000 Loan to this

court, where it was filed as Civ. A. No. 05-1149.

On April 28, 2006, Wachovia brought a mortgage foreclosure action against Christopher

in the Court of Common Pleas for Philadelphia County.  On August 2, 2006, Wachovia filed a

praecipe to discontinue the action.  On September 1, 2006, Wachovia brought another mortgage

foreclosure action against Christopher in the Court of Common Pleas for Philadelphia County

based on Christopher's failure to make payments on the 2000 Loan.  Christopher and Wachovia

stipulated to extend the discovery deadline in the Court of Common Pleas action until 100 days

after Christopher's federal court action arising from the 2000 Loan is resolved.

This court consolidated Civ. A. No. 05-0115 and Civ. A. No. 05-1149.  The consolidated

action was referred to the Honorable L. Felipe Restrepo, United States Magistrate Judge for the

Eastern District of Pennsylvania, for resolution of discovery issues and settlement discussions.

The action was transferred to this judge on July 9, 2007.

Defendants filed two motions for judgment on the pleadings under Federal Rule of Civil

Procedure 12(c).  In the first motion, defendants argued Christopher's claims arising from the

1997 Loan and 1998 Loan, brought under HOEPA (Count I), the Pennsylvania Usury Statute

(Count II), ECOA (Count III), Pennsylvania breach of fiduciary duty law (Count V),

Pennsylvania fraud law (Count VI), and RESPA (Count VII), were barred by the applicable

statutes of limitations.  In the second motion, defendants argued Christopher's claims arising

12

from the 2000 Loan, brought under HOEPA (Count I), the Pennsylvania Usury Statute (Count II), ECOA (Count III), Pennsylvania breach of fiduciary duty law (Count V), and RESPA (Count VI), also were barred by the applicable statutes of limitations.  Defendants did not move for judgment on the pleadings with respect to Christopher's claims under the Pennsylvania UTPCPL.

The court granted defendants' first motion for judgment on the pleadings, and Counts I, II, III, V, VI, and VII of Christopher's complaint arising from the 1997 and 1998 Loans were dismissed.  The court granted in part and denied in part defendants' second motion for judgment on the pleadings.  Counts I, III, V, and VI of Christopher's second complaint, arising from the 2000 Loan, were dismissed.  With respect to Count II, the court found Christopher's claim for interest paid before January 28, 2001, was time-barred, but Christopher could proceed on his Pennsylvania Usury Statute claim for interest paid on or after January 28, 2001.

Before the court are the parties' cross-motions for summary judgment of Christopher's remaining claims under the Pennsylvania Usury Statute and Pennsylvania UTPCPL, and defendants' motion *in limine* to preclude Christopher from calling Janet Gold, Esq., as a trial witness.

## III.   DISCUSSION

### A.      Cross-Motions for Summary Judgment

A motion for summary judgment is granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the burden of proving no genuine issue of material fact exists.  ABB Automation Inc. v. Schlumberger Resource Management Serv., Inc., 254 F.Supp. 2d. 479, 481 (3d Cir. 2002).  The court views the underlying facts and all

13

reasonable inferences in the light most favorable to the nonmoving party.  Id.  But for a

nonmoving party to survive a motion for summary judgment, there must be "sufficient evidence

favoring the nonmoving party for a jury to return a verdict for that party."  Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 249 (1986).  If the nonmoving party fails to make a sufficient showing

on an essential element of that party's case with respect to which it bears the burden of proof,

summary judgment should be granted.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

### 1. Pennsylvania Usury Statute

Christopher claims First Mutual violated the Pennsylvania Usury Statute, 41 Pa. Cons.

Stat. Ann. §§ 501 et seq..[5]  Christopher's claim is limited to interest paid on or after January 28,

2001.  Under the Pennsylvania Usury Statute, 41 Pa. Cons. Stat. Ann. § 301:

> (b) The maximum lawful rate of interest for residential mortgages . . . shall be
> equal to the Monthly Index of Long Term United States Government Bond Yields
> for the second preceding calendar month plus an additional two and one-half per
> cent per annum rounded off to the nearest quarter of one per cent per annum . . .

> (d) The loan yield obtained by a residential mortgage lender from the residential
> mortgage debtor shall not exceed the maximum lawful rate of interest for
> residential mortgages established in section 301(b) . . .

Any person affected by a violation of the Pennsylvania Usury Statute may bring a private

cause of action "for damages by reason of such conduct or violation, together with costs

including reasonable attorney's fees and such other relief to which such person may be entitled

under law."  41 Pa. Const. Stat. Ann. § 504.  Section 502 provides:

> A person who has paid a rate of interest for the loan or use of money at a rate in
> excess of that provided for by this act or otherwise by law or has paid charges

---

[5]Courts also refer to the Pennsylvania Usury Statute as the "Pennsylvania Loan Interest
and Protection Law" or "Act 6."  See e.g., Flores v. Shapiro & Kreisman, 246 F. Supp. 2d 427,
430 (E.D. Pa. 2002).

prohibited or in excess of those allowed by this act or otherwise by law may recover triple the amount of such excess interest or charges in a suit at law against the person who has collected such interest or charges.

41 Pa. Const. Stat. Ann. § 502.

In his brief in support of his motion for summary judgment, Christopher cited the usury law, but did not offer any evidence in support of his claim. Christopher did not offer evidence of the "maximum lawful rate of interest" at the time the 2000 Loan was consummated. He has not offered any evidence showing that the 9.5% interest rate on the 2000 Loan exceeded the maximum lawful rate of interest. First Mutual provided evidence that the 2000 Loan was sold to First Union on February 15, 2000; Christopher has not provided evidence that First Mutual collected any excess interest or charges from Christopher before or after selling the 2000 Loan.

In his motion for summary judgment, Christopher also claims, for the first time, that the Pennsylvania Usury Statute obliges a residential mortgage lender to provide residential mortgage debtor disclosures required by TILA and RESPA. See 41 Pa. Cons. Stat. Ann. § 401. By memorandum and order dated October 10, 2007, this court limited Christopher's claim under the Pennsylvania Usury Statute to interest paid on or after January 28, 2001. Christopher v. First Mutual Corp., Civ. A. Nos. 05-115, 05-1149, 2007 WL 2972561, at *4-5 (E.D. Pa. Oct. 10, 2007). The court also found Christopher's TILA and RESPA claims barred by the applicable statutes of limitations. Id. at *3-4, 6-7. Any claim for damages under the Pennsylvania Usury Statute based on failure to provide TILA and RESPA disclosures is barred by the statutes of limitations.

Defendants' motion for summary judgment on Christopher's claim under the Pennsylvania Usury Statute will be granted. Christopher's motion for summary judgment on his Pennsylvania Usury Statute claim will be denied.

15

### 2.      Pennsylvania Unfair Trade Practices and Consumer Protection Law

Christopher claims First Mutual and Kelly violated the UTPCPL.  He concedes his

UTPCPL claim regarding the 1997 Loan is barred by the statute of limitations (Pl.'s Mot. Summ.

J. 6.), so the court will consider his allegations regarding the 1998 Loan and 2000 Loan only.

The Pennsylvania UTPCPL "protects consumers of goods and services from unfair or

deceptive trade practices or acts." Smith v. Commercial Banking Corp., 866 F.2d 576, 581 (3d

Cir. 1989).  The UTPCPL recognizes unequal bargaining power in the marketplace, and strives to

place sellers and consumers on more equal terms. Commonwealth v. Monumental Prop., Inc.,

459 Pa. 450, 458, 329 A.2d 812, 816 (1974).  Violations of the UTPCPL can be remedied

through private action.  The UTPCPL provides:

> Any person who purchases or leases goods or services primarily for personal,
> family or household purposes and thereby suffers any ascertainable loss of money
> or property, real or personal, as a result of the use or employment by any person of
> a method, act or practice declared unlawful by section 3 of this act, may bring a
> private action to recover actual damages or one hundred dollars ($100), whichever
> is greater.  The court may, in its discretion, award up to three times the actual
> damages sustained, but not less than one hundred dollars ($100), and may provide
> such additional relief as it deems necessary or proper.  The court may award to the
> plaintiff, in addition to other relief provided in this section, costs and reasonable
> attorney fees.

73 P.S. § 201-9.2.

Thus, a plaintiff bringing a private cause of action under the UTPCPL must establish: (1) he is a

purchaser or lessee; (2) the transaction deals with "goods or services"; (3) the goods or services

were primarily for personal, family, or household services; and (4) he suffered damages arising

from the purchase of goods or services. Keller v. Volkswagen of America, Inc., 733 A.2d 642,

646 (Pa. Super. 1999).

A preliminary issue is whether the refinancing of Christopher's mortgage loans

constitutes the sale of "goods or services" under the UTPCPL.  Although defendants concede the UTPCPL extends to loans financing the purchase of goods or services, they argue the UTPCPL does not extend to loans refinancing an existing first mortgage.  (Defs.' Mot. Summ. J. 16.) "[T]he business of mortgage lenders is the sale of a service within the scope of the [UTPCPL]." Smith, 866 F.2d at 582.  The business of a loan broker is "clearly a sale of a service within the scope of the [UTPCPL]."  In re Barker, 251 B.R. 250, 261 (Bkrtcy. E.D. Pa. 2000).  The UTPCPL has been applied to loan refinancing.  See e.g., id. (loan broker clearly violated UTPCPL by failing to disclose detrimental effect of refinancing loan); In re Milbourne, 108 B.R. 522, 537 (Bkrtcy E.D. Pa. 1989) (lender violated UTPCPL by proposing that customers refinance previous loans without disclosing disadvantages).  Given the courts' broad approach to the UTPCPL, see Smith, 866 F.2d at 581, the refinancing of mortgage loans constitutes a "service" under the UTPCPL.

A plaintiff bringing a claim under the UTPCPL must allege one of the "unfair or deceptive" acts or practices enumerated in section 2.  73 Pa. Cons. Stat. Ann. § 201-3; Romeo v. Pittsburgh Associates, 787 A.2d 1027, 1033 (Pa. Super. 2001).  Christopher alleges defendants' actions fall within two provisions of section 2: (1) "[r]epresenting that goods or services have . . . benefits . . . that they do not have," 73 Pa. Cons. Stat. Ann. § 201-2(4)(v); and (2) [e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding," id. § 201-2(4)(xxi).  The latter provision is called the "catchall provision."

Christopher also alleges a violation of UTPCPL § 201-7, which provides that where goods or services with a sale price of $25 or more "are sold or contracted to be sold to a buyer, as a result of, or in connection with, a contact or call on the buyer or resident at his residence either in person or by telephone," the consumer may avoid the contract or sale by notifying the seller

within three full business days of the sale.  73 Pa. Cons. Stat. Ann. § 201-7(a).  The buyer must

be informed at the time he signs the contract or purchases the goods or services of his right to

cancel.  73 Pa. Cons. Stat. Ann. § 201-7(d).

### i.    Representing that goods or services have benefits that they do not have

Christopher argues defendants violated the UTPCPL § 201-2(4)(v) because they

represented to Christopher that the 1998 Loan and 2000 Loan would be beneficial to him, when

in fact the loans were not beneficial.  To prevail on this argument, Christopher must establish a

representation by defendants is false, deceives or has a tendency to deceive, and is likely to make

a difference in the purchasing decision.  See Fay v. Erie Ins. Group, 723 A.2d 712, 714 (Pa.

Super. 1999).  In addition, Christopher must show he justifiably relied on the defendants'

wrongful conduct or representation and suffered harm as a result of that reliance.  See Yocca v.

Pittsburgh Steelers Sports, Inc., 578 Pa. 479, 854 A.2d 425, 438 (2004); see also Weinberg v.

Sun Co., 565 Pa. 612, 777 A.2d 442, 446 (2001).  He must establish "specific reliance on some

conduct or representation by the defendant that caused him to incur the loss in question."  Sexton

v. PNC Bank, 792 A.2d 602, 607 (Pa. Super. 2002).  Whether a party relied on a false

representation, and whether that reliance was reasonable or justifiable, are questions of fact.

Dilworth v. Metropolitan Life Ins. Co., 418 F.3d 345, 354 (3d Cir. 2005); Drelles v.

Manufacturers Life Ins. Co., 881 A.2d 822, 840 (Pa. Super. 2005).

Christopher has not produced any evidence of a misrepresentation regarding the benefits

of the 1998 Loan aside from the allegations in the pleadings and brief filed by counsel.  See Fed.

R. Civ. P. 56(e) (adverse party may not rely on pleadings to create issue for trial).  At his

deposition, Christopher did not testify that defendants represented the 1998 Loan or certain

aspects of the 1998 Loan would be beneficial to him.  Christopher has not identified any documents from First Mutual misrepresenting the terms of the 1998 Loan, and the court's review of the record did not find any documents.  Summary judgment on Christopher's claim regarding the 1998 Loan under UTPCPL § 201-2(4)(v) will be granted in favor of defendants

With respect to the 2000 Loan, Christopher has produced evidence of misrepresentations by defendants.  He has produced various documents, disclosing different loan terms, all signed January 31, 2000.  Some of these documents represented that the 2000 Loan had benefits it did not have.  For example, a settlement statement, signed by Christopher on January 31, 2000, stated Christopher would receive $3,225.10 in cash.  A different settlement statement, signed by Christopher on the same date, stated Christopher would receive $3,712.62 in cash.  A loan application, also signed by Christopher on the same date, stated Christopher would receive $3,601.57 in cash.  Christopher received $3,225.10 in cash after closing the 2000 Loan.  In addition, a Truth in Lending statement, signed January 31, 2000, disclosed a finance charge of $79,950.88; another Truth in Lending statement, also signed that date, disclosed a higher finance charge of $80,250.88.  According to Lesiger's affidavit, the former statement, disclosing the lower finance charge, was later corrected, but Christopher still was asked to sign it.  Because First Mutual presented documents with varying loan terms to Christopher on the date the 2000 Loan closed, a reasonable factfinder could conclude that First Mutual misrepresented the benefits of the 2000 Loan.

But there is no evidence Christopher justifiably relied on the incorrect loan terms to his detriment when he signed the loan documents.  At deposition, when presented with a signed settlement sheet for the 2000 Loan, Christopher testified he did not read the settlement sheet before signing it.  Christopher did not identify any false or misleading statements upon which he

19

relied before taking out the 2000 Loan.  He repeatedly stated he did not have any problem with

First Mutual.  Christopher has failed to produce evidence of justifiable reliance.  Defendants'

motion for summary judgment on Christopher's claim regarding the 2000 Loan under UTPCPL

§ 201-2(4)(v) will be granted.  Christopher's motion for summary judgment regarding the 2000

Loan under § 201-2(4)(v) of the UTPCPL will be denied.

### ii.        Fraudulent or deceptive conduct

Christopher also alleges defendants violated the catchall provision of the UTPCPL § 201-

2(4)(xxi) by engaging in fraudulent or deceptive conduct which created a likelihood of confusion

or misunderstanding.[6]  A deceptive act is "the act of intentionally giving a false impression" or "a

tort arising from a false representation made knowingly or recklessly with the intent that another

person should detrimentally rely on it."  In re Patterson, 263 B.R. 82, 94 (Bkrtcy. E.D. Pa. 2001)

(citation omitted).  "An act or practice is deceptive or unfair if it has the capacity or tendency to

deceive."  Christopher, No. 05-1149, 2006 U.S. Dist. LEXIS 2255, *7.

Christopher argues he is entitled to summary judgment because defendants engaged in

predatory lending activities such as imposing interest rates three percentage points above the rate

being charged to good-credit consumers, lending based on the value of the collateral rather than

---

[6]Defendants argue that the common law elements of fraud must be proved to recover
under the catchall provision.  This court already has decided that the catchall provision, amended
in 1996, prohibits both fraudulent *and deceptive* conduct, and that it is no longer necessary for a
plaintiff to demonstrate all elements of common law fraud to recover under the UTPCPL catchall
provision.  Christopher v. First Mutual Corp., No. 05-1149, 2006 U.S. Dist. LEXIS 2255, *9-10
(E.D. Pa. Jan. 20, 2006).  Since the Pennsylvania Supreme Court in the interim has not issued a
decision interpreting the 1996 amendment to the catchall provision, it is not necessary to revisit
the discussion here.  But although it is not necessary for Christopher to demonstrate all elements
of common law fraud, defendants are correct that Christopher must demonstrate the common law
elements of reliance and causation to recover under the UTPCPL.  See Weinberg, 777 A.2d at
446.

on Christopher's ability to repay the loan, making loans that do not meet Christopher's needs, making loans with terms so onerous there is a strong likelihood Christopher will be unable to pay, including onerous terms such as balloon provisions and prepayment penalties, and using fraud or deception to make the loan.  Christopher has not produced sufficient evidence to prevail on this argument.  For example, he has not produced evidence that the interest rates on the 1998 Loan or 2000 Loan were three percentage points higher than the rate being charged to good-credit consumers.

Christopher argues First Mutual lent based on the value of his collateral rather than on his ability to repay the loans because First Mutual unnecessarily financed his current taxes, water, and electric utilities.  Christopher also argues the loans did not satisfy his needs because his payments increased after his loan refinancing.  Christopher has not produced evidence that the refinancing of outstanding bills is an unfair practice.  Christopher also has not produced evidence that his payments increased as a result of refinancing.  Loan documents show Christopher had a monthly income of $1,327.52 when he took out the 1998 Loan, and the 1998 Loan refinancing decreased Christopher's monthly payments from $404 to $365.11.  Loan documents show that when Christopher took out the 2000 Loan, he had a monthly income of $1,670.09, and the 2000 Loan decreased his monthly payments from $412.46 to $321.63.  Christopher's motion for summary judgment on his claim under UTPCPL § 201-2(4)(xxi) will be denied.

Defendants argue they are entitled to summary judgment on Christopher's UTPCPL § 201-2(4)(xxi) claim because Christopher has not identified any fraudulent or deceptive conduct in violation of the catchall provision.  Although Christopher has not produced evidence regarding the 1998 Loan, there are issues of fact whether defendants committed unfair or deceptive practices in connection with the 2000 Loan, because on January 31, 2000, Christopher signed

two settlement statements disclosing different loan terms.  Christopher also argues there is an

issue of fact whether First Mutual deceived Christopher into believing that the sale of his loans

was only a 26% to 50% possibility, when First Mutual had already arranged to sell Christopher's

loan to another lending institution.  First Mutual represented that it was the lender for the 2000

Loan, and that there was only a 26% to 50% chance that the loan would be transferred to another

institution.  But on January 7, 2000, well before the closing of the 2000 Loan on January 31, First

Mutual prepared a document suggesting the loan would be serviced by First Union.  The 2000

Loan was sold to First Union shortly after the loan closed.

But Christopher has not produced evidence that he relied on defendants'

misrepresentations.  Christopher did not testify that he relied on any specific loan provisions or

assertions by First Mutual that it would service his loan.  Christopher testified that he did not

read the settlement sheet for the 2000 Loan before signing it.  Because Christopher did not read

the 2000 Loan documents, and because he did not identify any oral misrepresentations by

defendants outside of the pleadings, he has not produced evidence of justifiable reliance.

Defendants' motion for summary judgment on Christopher's claim under UTPCPL § 201-

2(4)(xxi) will be granted.

### iii.     Failure to notify of the right of rescission

Christopher alleges defendants violated UTPCPL § 201-7 by failing to notify him of his

right to cancel within three days of closing the 1998 Loan and 2000 Loan.  Section 201-7

provides:

§ 201-7.  Contracts; effect of rescission

(a)     Where goods or services having a sale price of twenty-five ($25) or more
are sold or contracted to be sold to a buyer, as a result of, or in connection with, a
contact with or call on the buyer or resident at his residence either in person or by

22

telephone, that consumer may avoid the contract or sale by notifying, in writing, the seller within three full business days following the day on which the contract or sale was made and by returning or holding available for return to the seller, in its original condition, any merchandise received under the contract or sale. . . .

(d)     Each buyer shall be informed at the time he signs the contract or purchases the goods or services, of his right to cancel.

73 Pa. Cons. Stat. Ann. § 201-2**.**

Violations of § 201-7 can be remedied through UTPCPL § 201-9.2, Culbreth v. Lawrence J. Miller, Inc., 328 Pa. Super. 374, 391 (1984), which provides a private right of action for actual damages or $100, whichever is greater.  The evidence shows Christopher received notice of his right to rescind the 1998 Loan, but there is an issue of fact whether Christopher received notice of his right to rescind the 2000 Loan.

Neither party has briefed the issue whether UTPCPL § 201-7 applies to the 2000 Loan. Section 201-7 is meant to provide protection in a broad range of "door-to-door" sales, but is not meant to encompass every transaction where a seller of goods or services has any contact with the buyer at his residence.  Lou Botti Constr. v. Harbulak, 760 A.2d 896, 898 (Pa. Super. 2000) (trial court's conclusion that transaction between parties was not within scope of § 201-7 was supported by evidence, where parties had been in social dating relationship before transaction, and there was dispute regarding who contacted whom to initiate transaction); Saler v. Hurvitz, 84 B.R. 45, 49 (Bkrtcy. E.D. Pa. 1988) (summary judgment that transaction was not within scope of § 201-7 where loan was made through loan broker and settled at title company office, but appraiser visited debtor's home prior to settlement).  UTPCPL § 201-7 "appears to be directed to the common situation where the door-to-door salesman contacts and consummates a contract at the home of the buyer, usually in the same visit where the buyer has little time to reflect between the contact and signing the contract."  Saler, 84 B.R. at 49.  The scope of UTPCPL § 201-7 also

23

embraces transactions commenced by "door-openers" such as mailings to a consumer's home. Id. at 50.

The closing of the 2000 Loan was held in Christopher's home, so the loan refinancing may have been made "in connection with" a contact with Christopher at his residence.  But the evidence shows that Christopher initiated the 2000 Loan by calling First Mutual.  Kelly testified that after closing the 1997 Loan, Christopher contacted him several times to refinance.  Lesiger stated in his affidavit that First Mutual has a policy of not contacting borrowers within twenty-four months of the closing of a loan.  Moreover, Christopher contacted First Mutual on December 31, 1999; he signed an Estimated Truth in Lending Statement on January 19, 2000; and the loan closed on January 31, 2000, a month after Christopher's first contact with First Mutual regarding the 2000 Loan.  The loan transaction may be too dissimilar from door-to-door sales, where the buyer has little time to reflect before signing the contract, to be within the scope of UTPCPL § 201-7.  The parties will be provided an opportunity to address this issue on May 1, 2008, at 2:00 p.m.

It is also unclear what damages Christopher seeks.  Defendants' motion for summary judgment regarding Christopher's claim under UTPCPL § 201-7 will be taken under advisement pending argument on the following issues: (1) whether UTPCPL § 201-7 applies to the 2000 Loan; (2) whether Christopher is able to return or make available the proceeds of the 2000 Loan if he seeks avoidance of the contract; and (3) what damages Christopher may seek.  Christopher's motion for summary judgment on his claim under UTPCPL § 201-7 will be denied as there is an issue of fact whether Christopher received notice of his right to rescind the 2000 Loan.

### iv.    Violation of other consumer protection laws

Finally, Christopher claims violations of various consumer protection laws, including

24

RESPA and TILA, as amended by HOEPA, are actionable as *per se* violations of the UTPCPL.[7]

He argues he is entitled to summary judgment on his UTPCPL claim because defendants violated

RESPA and TILA.  Some consumer protection statutes explicitly provide that a violation of the

statute are deemed a violation of the UTPCPL.  See e.g., 73 P.S. § 2190(a) (violation of any

provision of Credit Services Act also a violation of UTPCPL); 73 P.S. § 1961 (violation of

Automobile Lemon Law also a violation of UTPCPL).  In contrast, the statutory language of

RESPA and TILA, as amended by HOEPA, does not provide that a violation of those statutes is a

violation of the Pennsylvania UTPCPL.  Cf. Moroz v. Alexico Corp., Civ. A. No. 07-3188, 2008

WL 109090, at *7 (E.D. Pa. Jan. 8, 2008) (legislature's failure to include provision regarding

UTPCPL in the Motor Vehicle Sales Financing Act ("MVSFA") strongly suggests that it did not

intend an MVSFA violation to be a *per se* UTPCPL violation).

     Christopher cites several cases to support his argument that violations of consumer

protection statutes generally could be enforced under the UTPCPL.  Christopher's reading of

these cases is too expansive.  In Pekular v. Eich, the court considered whether the enactment of

the Unfair Insurance Practices Act ("UIPA"), which regulated the insurance industry and was

enforced by the Insurance Commissioner of Pennsylvania, but did not provide a private cause of

action, barred an insured from pursuing a private cause of action against his insurer under the

UTPCPL.  355 Pa. Super. 276, 513 A.2d 427, 428 (1986).  The court reviewed precedent finding

that violations of other statutes may also be violations of the UTPCPL.  It noted that in the

instant case, the alleged unfair or deceptive acts of defendants clearly fell within the language of

---

[7]In his motion for summary judgment, Christopher appears to allege, for the first time, violation of the Credit Services Act ("CSA").  Christopher did not assert a CSA claim in his amended complaint and did not move to amend his complaint to assert this claim.  The court declines to consider any claim under the CSA at this time.

the UTPCPL.  Id. at 433.  The court concluded the UIPA did not represent the exclusive deterrent to alleged unfair or deceptive acts of insurers, and plaintiffs could bring a private cause of action against their insurer under the UTPCPL.  Id. at 434.

In Hardy v. Pennock Ins. Agency, Inc., appellants alleged they "justifiably relied to their detriment upon allegedly intentional misrepresentations made by their insurance agent."  365 Pa. Super. 206, 529 A.2d 471, 477 (1987).  The court followed Pekular and held that unfair or deceptive acts of insurers or their agents could be redressed by private cause of action under the UTPCPL as well as by administrative hearing under the UIPA.  Id. at 479.

Essentially, Pekular and Hardy held that where a violation of the UTPCPL is alleged, the UIPA does not bar a private cause of action under the UTPCPL.  Neither Pekular nor Hardy finds that a violation of any consumer protection statute constitutes a *per se* violation of the UTPCPL, where the language of the underlying statute does not provide for enforcement under the UTPCPL.  See Abrams v. Toyota Motor Credit Corp., No. 071049, 2001 WL 1807357, at *8 (Pa. Com. Pl. Dec. 5, 2001).  Christopher has not cited any precedent establishing that a violation of RESPA or TILA constitutes a *per se* violation of the UTPCPL.

This action is further distinguishable from cases allowing claims under some other consumer statutes to be enforced through the UTPCPL, because this court has already dismissed Christopher's RESPA and TILA claims under the statute of limitations.  Christopher v. First Mutual Corp., Civ. A. Nos. 05-0115, 05-1149, 2007 WL 2972561 (E.D. Pa. Oct. 9, 2007).  If Christopher prevailed on his argument, he would be able to avoid the statutes of limitations on his RESPA and TILA claims.  Cf. Gordon v. Pennsylvania Blue Shield, 378 Pa. Super. 256, 548 A.2d 600, 602-04 (1988) (court would not entertain claim that violation of UIPA was a *per se* violation of the UTPCPL, because it was not within court's authority to consider alleged

26

violations of UIPA).

Christopher cannot establish a *per se* violation of the UTPCPL by establishing a violation of RESPA or TILA, because neither the statutory language of RESPA nor TILA provides for enforcement under the UTPCPL, and because both the RESPA and TILA claims are barred by the statute of limitations. Christopher's motion for summary judgment on his UTPCPL claim will be denied.

### B.    Motion to Preclude Plaintiff from Calling Janet Gold, Esq., as a Witness

Defendants filed a motion *in limine* to preclude Christopher from calling defense counsel, Janet Gold, Esq. ("Gold"), as a trial witness. Defendants argue they would suffer substantial hardship if Gold were required to testify and disqualified as counsel. Christopher argues Gold's testimony is necessary because Gold had extensive knowledge and involvement with the 1997, 1998, and 2000 Loan documents.

The court considers whether testimony by Gold regarding the 1997, 1998, and 2000 Loans implicates the attorney-client privilege. Because Christopher's remaining claims arise under Pennsylvania law, the court applies Pennsylvania privilege law. See Montgomery County v. MicroVote Corp., 175 F.3d 296, 301 (3d Cir. 1999). Under Pennsylvania law: "In a civil matter counsel shall not be competent or permitted to testify to confidential communications made to him by his client, nor shall the client be compelled to disclose the same, unless in either case the privilege is waived upon the trial by the client." 42 Pa. C.S.A. § 5928. For the attorney-client privilege to apply, "[t]he communications must be for the purpose of obtaining legal advice." In re Ford Motor Co., 110 F.3d 954, 965 (3d Cir. 1997). On behalf of First Mutual, Gold reviewed the Note, mortgage, affidavit of title, and title search for the 1997 Loan to ensure the mortgage would be secured in a first lien position. (Lawrence Lesiger Aff. ¶ 12.) Gold also

verified that the 1998 Loan was secured by a first lien position against the real estate.  (Id. ¶ 24.)

Gold's impressions and communications regarding the loans constitute privileged work product

and legal advice to First Mutual.  Any testimony by Gold regarding her review of the 1997, 1998,

and 2000 Loans, and subsequent legal advice, is barred by the attorney-client privilege.

Defendants' motion *in limine* to preclude the testimony of Janet Gold, Esq., will be granted.

## IV.    CONCLUSION

Defendants' motion for summary judgment on Christopher's Pennsylvania Usury Statute

claim will be granted.  Defendants' motion for summary judgment on Christopher's UTPCPL

claim will be granted in part.  Defendants' motion for summary judgment on Christopher's claim

UTPCPL § 201-2(4)(v) will be granted.  Defendants' motion for summary judgment on

Christopher's claim under UTPCPL § 201-2(4)(xxi) will be granted.  Defendants' motion for

summary judgment on Christopher's claim under UTPCPL § 201-7 will be taken under

advisement pending argument on the following issues: (i) whether UTPCPL § 201-7 applies to

the 2000 Loan; (ii) whether Christopher is able to return or make available the proceeds of the

2000 Loan if he seeks avoidance of the contract; and (iii) what damages Christopher may seek.

Christopher's motion for summary judgment on his claims under the Pennsylvania Usury Statute

and the UTPCPL will be denied.  Defendants' motion *in limine* to preclude Christopher from

calling Janet Gold, Esq., as a witness at trial will be granted.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JOHN J. CHRISTOPHER | : | CIVIL ACTION |
| | : | |
| | : | |
| v. | : | |
| | : | NO. 05-0115 |
| FIRST MUTUAL CORP. and | : | NO. 05-1149 |
| RICHARD KELLY | : | CONSOLIDATED |

## ORDER

**AND NOW**, this 21st day of April, 2008, upon consideration of defendants' motion for summary judgment (paper no. 57), plaintiff's cross-motion for summary judgment (paper no. 60), and defendants' corrected motion *in limine* to preclude plaintiff from calling Janet Gold as a witness at trial (paper no. 67), and responses, for the reasons stated in the accompanying memorandum, it is **ORDERED** that:

1. Defendants' motion for summary judgment (paper no. 57) is **GRANTED in part**.
    a. Defendants' motion for summary judgment on plaintiff's usury claim (Count II of both complaints) is **GRANTED**.
    b. Defendants' motion for summary judgment on plaintiff's claim under the Unfair Trade Practices and Consumer Protection Law, 73 Pa. Cons. Stat. Ann. § 201-2(4)(v) (Count IV of both complaints), is **GRANTED**.
    c. Defendants' motion for summary judgment on plaintiff's claim under the Unfair Trade Practices and Consumer Protection Law, 73 Pa. Cons. Stat. Ann. § 201-2(4)(xxi) (Count IV of both complaints), is **GRANTED**.
    d. Defendants' motion for summary judgment on plaintiff's claim under the Unfair Trade Practices and Consumer Protection Law, 73 Pa. Cons. Stat. Ann. § 201-7 (Count IV of both complaints), is **taken under advisement** pending oral argument on the following issues:
        (i) whether UTPCPL § 201-7 applies to the 2000 Loan;
        (ii) whether Christopher is able to return or make available the proceeds of the 2000 Loan if he seeks avoidance of the contract; and
        (iii) what damages Christopher may seek.

2. Plaintiff's motion for summary judgment (paper no. 60) is **DENIED**.

3. Judgment is entered in favor of defendant, First Mutual, on Christopher's claim under the Pennsylvania Usury Statute (Count II of both complaints).

4. Defendants' motion *in limine* to preclude plaintiff from calling Janet Gold as a

witness at trial (paper no. 67) is **GRANTED**.

     5.     Oral argument is scheduled for **May 1, 2008** at **2:00 p.m.**.  The parties shall be prepared to address the aforementioned issues with respect to plaintiff's remaining claim under UTPCPL § 201-7.

 

/s/ Norma L. Shapiro                  
                                  S.J.